UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
NORTHERN DIVISION

| | |
|---|---|
| CRAIG B., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER REVERSING AND REMANDING COMMISSIONER'S DECISION** <br><br> Case No. 1:21-cv-00127 <br><br> Magistrate Judge Daphne A. Oberg |

Plaintiff Craig B.[1] brought this action against Kilolo Kijakazi, Acting Commissioner of the Social Security Administration (the "Commissioner"), seeking judicial review of the denial of his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. (*See* Compl., Doc. No. 2.) The Administrative Law Judge ("ALJ") determined Mr. B. did not qualify as disabled. (Certified Tr. of Admin. R. ("Tr.") 22–33, Doc. No. 12.) The court[2] has carefully reviewed the entire record and the parties' briefs.[3] Because the ALJ failed to properly consider the medical opinions of Mr. B.'s treating doctor and a physical therapist who examined Mr. B., the Commissioner's decision is reversed and the case is remanded for further administrative proceedings.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in certain cases, including Social Security cases, the court refers to Plaintiff by his first name and last initial only.

[2] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (Doc. No. 9.)

[3] This order is based on the written memoranda, as oral argument is unnecessary. *See* DUCivR 7-1(g).

1

STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review of a final decision of the Commissioner. This court reviews the ALJ's decision to determine whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principals have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005).

An ALJ's factual findings are "conclusive if supported by substantial evidence." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153, ___ U.S. ___ (2019) (internal quotation marks omitted). Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla." *Id.* at 1154 (internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Lax*, 489 F.3d at 1084 (internal quotation marks omitted). And the court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

APPLICABLE LAW

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is considered

disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In making a disability determination, the ALJ employs a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;
2) the claimant has a severe medically determinable physical or mental impairment or combination of impairments;
3) the impairment or combination of impairments is equivalent to an impairment, which precludes substantial gainful activity, listed in the appendix of the relevant disability regulation;
4) the claimant has a residual functional capacity to perform past, relevant work; and
5) the claimant has a residual functional capacity to perform other work in the national economy considering his/her/their age, education, and work experience.

*See* 20 C.F.R. § 404.1520(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988). The claimant has the burden of establishing disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show the claimant retains the ability to perform other work existing in the national economy. *Id.*

## PROCEDURAL HISTORY

Mr. B. applied for Title II disability insurance benefits after he was shot in a hunting accident and lost vision in his left eye when he was sixty years old. (*See* Tr. 28, 242–48.) He

filed his application on November 2, 2015, alleging disability beginning on March 22, 2014. (*Id.* at 22, 242–48.)  The ALJ found Mr. B. last met the insured status requirements of the Social Security Act on December 31, 2017.  (*Id.* at 24.)

After a hearing, the ALJ issued a decision on May 22, 2018, finding Mr. B. was not disabled during the period from his alleged onset date to his last insured date.  (*Id.* at 116–33.)  Mr. B. appealed, and the Appeals Council reversed and remanded for further proceedings.  (*Id.* at 134–38.)  The ALJ held a second hearing, (*id.* at 40–59), and issued a decision on July 15, 2019, again finding Mr. B. not disabled, (*id.* at 22–33).

At step two of the sequential evaluation, the ALJ found Mr. B. had the severe impairments of left eye blindness and bilateral hearing loss.  (*Id.* at 25.)  The ALJ found Mr. B. had nonsevere impairments of obesity and adjustment disorder with mixed anxiety and depressed mood.  (*Id.*)  At step three, the ALJ found Mr. B.'s impairments did not meet or equal the severity of listed impairment.  (*Id.* at 26–27.)  Ultimately, the ALJ determined Mr. B. had the residual functional capacity to perform a full range of work at all exertional levels with the following nonexertional limitations:

> [Mr. B.] must avoid concentrated exposure to hazards and avoid work requiring depth perception and leftsided peripheral vision, but he can avoid ordinary hazards in the workplace.  He must also avoid work requiring fine hearing capability and avoid working environments with greater than moderate levels of noise, as the term moderate is defined in the Selected Characteristics of Occupations.

(*Id.* at 27.)  Based on this residual functional capacity, the ALJ found Mr. B. was unable to perform his past relevant work as a welder.  (*Id.* at 31.)  But the ALJ determined Mr. B. was not disabled because, at step five, he found Mr. B. capable of performing other jobs existing in significant numbers in the national economy.  (*Id.* at 32–33.)  The Appeals Council denied Mr.

4

B.'s request for review, (*id.* at 1), making the ALJ's decision final for purposes of judicial review.

## DISCUSSION

Mr. B. argues the ALJ erred in his residual functional capacity determination by (1) failing to properly evaluate the medical opinions of his treating doctor and a physical therapist, and (2) failing to consider evidence of his limitations related to reading and writing. (Opening Br. 7–15, Doc. No. 15.) Mr. B. also argues the ALJ erred at step five by failing to properly develop the record, explain his findings, and resolve contradictions between the testimony of two vocational experts on which he relied. (*Id.* at 15–17.)

**1. Evaluation of Medical Opinions**

Mr. B. argues the ALJ failed to properly consider the medical opinions of Dr. Richard Stevens, his treating physician, and Mr. Sharik Peck, a physical therapist.

*a. Legal Standards*

Because Mr. B.'s claim was filed before March 27, 2017, the regulations in 20 C.F.R. § 404.1527 govern the ALJ's consideration of medical opinion evidence.[4] Under this framework, the ALJ must "give consideration to all the medical opinions in the record" and "discuss the weight [the ALJ] assigns to such opinions." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012); *see also* 20 C.F.R. § 404.1527(c) (requiring the ALJ to evaluate every medical opinion and listing the factors to be considered in assigning weight to a medical opinion). The ALJ must give a treating physician's medical opinion "controlling weight" if it is

---

[4] The Social Security Administration revised its rules regarding the evaluation of treating physician opinions for claims filed on or after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Med. Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132 (Mar. 27, 2017)).

"well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). This analysis is sequential, meaning "if the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Watkins*, 350 F.3d at 1300. While an express finding with respect to this first question was once considered mandatory, the Tenth Circuit has since declined to remand where it could determine from the ALJ's decision that it "implicitly declined to give the opinion controlling weight." *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).

If the ALJ does not give a treating source opinion controlling weight, the ALJ must consider the level of deference to give it, using the factors in 20 C.F.R. § 404.1527(c). These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins*, 350 F.3d at 1301 (internal quotation marks omitted). The same factors are used to determine the weight given to medical opinions from non-treating sources. 20 C.F.R. § 404.1527(c).

The ALJ need not "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007). But the ALJ must "give good reasons" for the weight assigned to a treating source's medical opinion. *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1527(c)(2). The court may not supply possible reasons for

6

giving less weight to or rejecting a medical opinion but may only evaluate the ALJ's decision on its stated reasons.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084–85 (10th Cir. 2004).

    b.  *Mr. Sharik Peck*

On January 7, 2018, physical therapist Sharik Peck provided a functional capacity assessment based on a two-day physical examination of Mr. B.  (Tr. 511–19.)  Mr. Peck opined Mr. B. had "the ability to perform productive work activity at the Light level according to the Dictionary of Occupational Titles."  (*Id.* at 513.)  Mr. Peck performed twenty-six tests and made specific findings as to Mr. B.'s abilities to do activities such as lifting and carrying, pushing and pulling, standing and walking, bending and reaching, and climbing stairs during an eight-hour workday.  (*Id.*)  Mr. Peck explained Mr. B.'s "limitations in depth perception [] affect his balance and proprioception," and noted he was "also limited by craniofacial pain triggered by exertion and certain postures (kneeling, squatting, pushing, pulling, lifting, and generally exerting himself)."  (*Id.* at 511.)  Mr. Peck opined "[t]he functional limitations observed during this testing affect [Mr. B.'s] ability to work safely around moving equipment and on uneven surfaces."  (*Id.*)

The ALJ gave "partial weight" to Mr. Peck's opinions.  (Tr. 30.)  The ALJ found the assessed exertional limitations were "inconsistent with the findings noted in his exam," and inconsistent with the consultative physical examination performed by Dr. Richard Ingebretsen and the medical record overall.  (*Id.*)  The ALJ found the assessed postural and manipulative limitations were "not supported by the [medical record] overall and not supported by explanation in this exam."  (*Id.*)  Specifically, the ALJ found "the statements regarding poor balance, coordination, and proprioception [were] conclusory and [were] supported only by vague statements such as 'trying to judge distances of objects without complete success,' 'often hitting

7

the shelves when trying to lift objects onto them,' 'at times overreaching and at times under reading due to limited depth perception.'" (*Id.*)  The ALJ then stated Mr. B.'s visual limitation "would limit his functional capacity in some respects, as indicated in the residual functional capacity, but would not limit him, for example, in his ability to climb ramps or stairs." (*Id.*) Finally, the ALJ noted Mr. B. still led an active lifestyle and was still able to do outdoor activities and chores, "suggesting [the] limitations Mr. Peck alleged [were] not entirely accurate." (*Id.*)

As discussed below, several of the ALJ's stated reasons for partially discounting Mr. Peck's opinion are unexplained, unsupported, or contrary to the record.  Because of these deficiencies, the ALJ failed to properly consider Mr. Peck's opinion.

First, the ALJ failed to explain how Mr. Peck's assessed exertional limitations were inconsistent with his examination findings, with Dr. Ingebretsen's examination, or with the medical record overall.  (*See* Tr. 30.)  The ALJ did not identify any specific inconsistencies in the examination records, and he did not identify any other medical records inconsistent with Mr. Peck's opinion.  Mr. Peck performed testing and found Mr. B. could lift or carry forty pounds occasionally, twenty pounds frequently, and ten pounds constantly.  (*Id.* at 513.)  He noted Mr. B.'s abilities in this area were affected by poor depth perception and "limited proprioception/coordination," and that "pushing and pulling and lifting activities cause[d] intra-ocular pressure to increase."  (*Id.* at 513, 517.)  It is unclear how Mr. Peck's findings were inconsistent with his assessed limitations.  It is also unclear how Dr. Ingebretsen's examination was inconsistent with Mr. Peck's opinions.  Dr. Ingebretsen observed Mr. B. walked normally, was able to rise from a chair without assistance, and was able to squat "about 100% of normal." (*Id.* at 495.)  But he did not perform testing related to lifting, carrying, pushing, or pulling, and

he did not offer opinions about specific exertional limitations. (*Id.* at 493–95.) With regard to the medical record overall, the ALJ did not cite or identify any records inconsistent with Mr. Peck's opinion regarding exertional limitations. Without further explanation, it is impossible to determine what the ALJ was referring to or whether his finding regarding inconsistency is supported by the record.

Second, the ALJ failed to acknowledge that Mr. Peck's findings regarding postural limitations, manipulative limitations, and limitations in proprioception, coordination, and balance were based on direct observations and testing. The ALJ stated Mr. Peck's findings were supported only by "conclusory" and "vague" statements. (*Id.* at 30.) But Mr. Peck noted limitations in these areas on specific tests—such as "poor balance" during toe rises and "poor proprioception" during knee squats. (*Id.* at 517.) Mr. Peck also conducted tests for hand coordination, bending and reaching, elevated reaching, and climbing stairs. (*Id.* at 514.) Mr. Peck "observed overreaching and underreaching as well as frequently bumping into shelves with a lifting basket as he has difficulty judging the height." (*Id.* at 517.) By ignoring the supporting observations and testing documented in the examination record, the ALJ mischaracterized the record and failed to account for evidence supporting Mr. Peck's findings.

Third, the ALJ also failed to explain his finding that the assessed postural and manipulative limitations were not supported by the medical record overall. He did not cite to the record or identify any evidence inconsistent with Mr. Peck's opinions in this area. (*See id.* at 30.)

Fourth, the ALJ offered no explanation or support for his statement that Mr. B.'s visual limitation would not limit his ability to climb ramps or stairs. (*Id.* at 30.) Mr. Peck conducted "stair climb" testing, noted "poor depth perception" and "limited proprioception/coordination" in

9

this area, and opined Mr. B. would be limited to "frequently" climbing stairs (34% to 66% of the workday). (*Id.* at 513.) Mr. Peck explained Mr. B.'s limited depth perception affected his balance, and he stated "[t]he functional limitations observed during this testing affect[ed] [Mr. B.'s] ability to work . . . on uneven surfaces." (*Id.* at 511.) Mr. Peck's findings were consistent with Mr. B.'s testimony that he struggled to walk on uneven ground and climb stairs. (*See id.* at 45–49.) But the ALJ simply stated a contrary finding, without any explanation or citation to the record. The ALJ's bare, unsupported assertion that Mr. B. was not limited in his ability to climb ramps or stairs was not a valid basis to discount Mr. Peck's medical opinion.

The only other reason the ALJ provided for partially discounting Mr. Peck's opinion was the fact that Mr. B. led an active lifestyle and was still able to do outdoor activities and chores. (*Id.* at 30.) But both Mr. B. and his wife testified he struggled with these activities due to his depth perception and balance issues: he fell frequently, had difficulty doing things in the yard, and couldn't carry laundry or groceries. (*Id.* at 45–47, 50–51.) In light of this testimony and the other deficiencies outlined above, this rationale is insufficient, on its own, to support partially discounting Mr. Peck's opinion.

In sum, the ALJ failed to give "good reasons" supported by substantial evidence for the weight assigned to Mr. Peck's opinion.

   c. Dr. Richard Stevens

Dr. Richard Stevens was Mr. B.'s primary care doctor during the relevant time period. (*See* Tr. 520.) Dr. Stevens evaluated Mr. B. on January 17, 2018, and provided a letter containing medical opinions on January 23, 2018. (*Id.* at 520–21.) Mr. Stevens noted Mr. B. was blind in his left eye and had "difficulty with craniofacial pain left side, eye, especially when he squats or lifts or bends over much." (*Id.* at 520.) Dr. Stevens stated this was "quite

debilitating to him and cause[d] significant pain and discomfort" and "limit[ed] his functioning." (*Id.*)  Dr. Stevens opined Mr. B. had difficulty with depth perception, causing him to fall often. (*Id.*)  He opined Mr. B. also had poor coordination, hand-eye coordination, and proprioception and often lost his balance.  (*Id.*)  Dr. Stevens stated Mr. B. experienced depression and anxiety and had "a hard time functioning" due to these issues.  (*Id.*)  Dr. Stevens stated he had reviewed Mr. Peck's evaluation and agreed with the "specific limitations and disability specified within that report."  (*Id.*)  Finally, he stated Mr. B. was "quite disabled from [the] injury he sustained" and "unable to work any physical job."  (*Id.* at 521.)

At the beginning of his discussion of the opinion evidence, the ALJ stated "[c]ontrolling weight [did] not apply to any of the opinions from treating sources because the opinions are not entirely consistent with other substantial evidence in the record."  (*Id.* at 29.)  In addressing Dr. Stevens' opinions, the ALJ gave "great weight" to the opinions regarding depth perception because they were "consistent with the medical records overall."  (*Id.* at 30.)  But the ALJ gave "little weight to the opinions regarding exertional limitations, coordination, balance, and proprioception because there [were] no treatment notes from this provider supporting them."  (*Id.* at 30–31.)  The ALJ also gave "little weight" to Dr. Stevens' statement that Mr. B. was disabled because it concerned an issue reserved to the Commissioner.  (*Id.* at 30.)

The ALJ's statement that there were no treatment notes from Dr. Stevens supporting his opinion is factually incorrect.  The medical record contains Dr. Stevens' treatment notes from multiple visits between August 2017 to March 2018, (*id.* at 531–41), including the January 17, 2018 examination Dr. Stevens referenced in his letter, (*id.* at 533–35).  During that visit, Dr. Stevens noted under "general examination" that Mr. B. had "poor finger to nose coordination," "poor finger to my finger coordination," and was "not accurate in his placement."  (*Id.* at 534.)

11

Dr. Stevens noted Mr. B. was "showing severe limitations in depth perception, and also proprioception and hand eye coordination." (*Id.*)  Dr. Stevens also noted "dizziness" among Mr. B.'s symptoms. (*Id.* at 533.)  Dr. Stevens also noted Mr. B. experienced craniofacial pain when he squatted, lifted, or bent over. (*Id.*)  Thus, Dr. Stevens' treatment notes contain observations and findings supportive of his opinions regarding exertional limitations, coordination, balance, and proprioception.  By stating no treatment records existed, the ALJ mischaracterized the evidence and failed to consider evidence supportive of Dr. Stevens' opinions.

The ALJ's general statement that all treating sources' opinions were not entirely consistent with other record evidence lacks any explanation or support.  The ALJ did not cite to the record or identify any evidence inconsistent with Dr. Stevens' opinions.  This bare conclusion prevents meaningful judicial review.

For these reasons, the ALJ's failed to properly evaluate Dr. Stevens' opinions.

    d.  *Reversal Is Required*

The ALJ's failure to properly evaluate the medical opinions of Mr. Peck and Dr. Stevens requires reversal.  When an ALJ erroneously discounts or rejects a medical opinion, the error can only be considered harmless "if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity." *Mays v. Colvin*, 739 F.3d 569, 578–79 (10th Cir. 2014).  Mr. Peck and Dr. Stevens opined Mr. B. was only capable of light work and assessed limitations related to balance, coordination, and proprioception not included in the RFC.  Therefore, reversal and remand is required for further consideration of the opinions of Mr. Peck and Dr. Stevens.

    **2.  Reading and Writing Limitations**

Mr. B. next contends the ALJ erred by failing to address evidence of Mr. B.'s limitations related to reading and writing. (Opening Br. 13–15, Doc. No. 15.)

Mr. B. testified he was "illiterate" and had difficulty writing letters and reading. (Tr. 64.) During a psychological evaluation, Mr. B. reported a history of challenges in school, stating he stopped attending school consistently in middle school, dropped out his sophomore year of high school, and never learned to read adequately. (*Id.* at 489.) Mr. B.'s wife also testified he had trouble reading, and she said she read everything to him and took care of bills. (*Id.* at 83.) Ms. B.'s wife also filled out all Social Security forms on his behalf. (*Id.* 306, 314, 323, 332.) When asked about his ability to follow written instructions, he indicated he could not read very well and was "almost illiterate." (*Id.* at 330.)

The ALJ did not mention this evidence in the opinion, made no findings regarding Mr. B.'s alleged reading and writing limitations, and did not include limitations related to reading and writing in his residual functional capacity assessment. Mr. B. argues the ALJ's failure to address this issue was harmful because the jobs the ALJ found Mr. B. could perform require reading and writing beyond Mr. B.'s abilities. (Opening Br. 14–15, Doc. No. 15.) The Commissioner, on the other hand, argues Mr. B.'s past work demonstrates Mr. B. met the reading and writing requirements of these jobs—but Mr. B. disputes this. (Answer Br. 14–15, Doc. No. 21; Reply Br. 5–6, Doc. No. 22.)

Because the Commissioner's decision is reversed on other grounds, the court need not determine whether the ALJ's failure to address this issue warrants reversal. On remand, the ALJ should consider evidence of Mr. B.'s limitations related to reading and writing in determining Mr. B.'s residual functional capacity and ability to perform jobs in the national economy.

3. **Step Five Determination**

Finally, Mr. B. argues the ALJ erred in his utilization of vocational expert testimony at step five. (Opening Br. 15–17, Doc. No. 15.) Specifically, Mr. B. argues the ALJ erred by relying partly on vocational expert testimony from the first hearing and partly on vocational expert testimony from the second hearing, without explaining his reasoning or resolving discrepancies between the two experts' testimony. (*Id.*)

The ALJ posed the same hypothetical RFC to both vocational experts, which also matches his ultimate RFC finding. (Tr. 52–53, 85.) Given this RFC, the vocational expert at the first hearing testified Mr. B. could perform three "medium work" jobs in the national economy: floor cleaner, janitor, and hand launderer. (*Id.* at 85.) At the second hearing, presented with the same RFC, a different vocational expert began to testify about a "light work" job Mr. B. could perform. (*Id.* at 53.) The ALJ then instructed the expert to state only how many positions existed in the national economy for each of the three jobs identified by the previous vocational expert, without testifying about whether these jobs fit the hypothetical. (*Id.* at 53–54.) The vocational expert provided numbers substantially lower than the numbers provided by the previous expert. (*Id.* at 54, 85.) In his decision, the ALJ relied on the jobs identified by the first expert and the numbers provided by the second expert. (*Id.* at 32.) The ALJ did not mention that his findings were based on two different experts' testimony.

Mr. B. argues the ALJ erred by not permitting the second expert to testify about whether the previously identified jobs fit the hypothetical RFC, and by failing to elicit testimony regarding the discrepancy between the two experts' job numbers. (Opening Br. 17, Doc. No. 15.) Mr. B. points out, given his age, education, and past work, a finding of disabled would be required if he were limited to light work. (*Id.* at 12–13, 16–17.) He asserts the ALJ cannot "mix

and match" the testimony of the two experts without explaining his reasoning.  (Reply 6, Doc. No. 22.)

Because the Commissioner's decision is reversed on other grounds, requiring the ALJ to reconsider Mr. B.'s RFC on remand, the court need not determine whether the manner in which the ALJ utilized vocational expert testimony from the prior hearings was erroneous.  However, if the ALJ relies on vocational expert testimony on remand, the ALJ should explain how he considered the testimony in order to provide a reviewing court with "a sufficient basis to determine that appropriate legal principals have been followed."  *Jensen*, 436 F.3d at 1165.

## CONCLUSION

The Commissioner's decision is REVERSED and the case is REMANDED for further administrative proceedings consistent with this order.

DATED this 26th day of September, 2022.

BY THE COURT:

*Daphne A. Oberg*
Daphne A. Oberg
United States Magistrate Judge